## THE NEW YORK CENTRAL NO. 17.

District Court, E. D. New York.

May 20, 1930.

Macklin, Brown, Lenahan & Speer, of New York City (by J. Dudley Eggleston, of New York City), for libelants.

Bigham, Englar & Jones, of New York City (by A. J. McElhinney and L. J. Matteson, both of New York City), for claimants.

INCH, District Judge.

Libelants Spooner & Son and the Central Railroad of New Jersey claim that certain boats owned by them were damaged, by the carelessness of the captain of the steamtug New York Central No. 17. They commenced suit to recover such damage.

The facts in each suit are the same. They were therefore duly tried together. One opinion will suffice. There is little law involved. The conflict is one of fact. A considerable amount of oral testimony has been taken.

The real issue is as follows: Two car floats owned by the Central Railroad of New Jersey went adrift and ran into a pump boat owned by Spooner & Son. Libelants claim these car floats went adrift solely because they were carelessly run into by a car float in tow of the New York Central tug No. 17. The liability therefore of the claimants is

based upon the alleged negligence of the captain of the tug No. 17.

The burden of proof to show by a fair preponderance of evidence that the captain of this tug No. 17 was so negligent and that this negligence caused the breaking adrift of the two floats rests upon the libelants.

It will not avail the libelants in these suits if the floats went adrift from some other cause than that of the neglect of the captain of the tug No. 17.

This is not a case of res ipsa loquitur and unless a contact between the float in tow of tug No. 17 and the other floats is shown, the necessity for an explanation on the part of claimants would not arise. As to a discussion of this doctrine, see Erie R. R. v. Murphy (C. C. A. 2d) 9 F.(2d) 525.

Accordingly, with due regard to the above burden on libelant, and the law above referred to, we can state at the outset some of the facts which are not seriously disputed.

On October 28, 1925, about 9 o'clock at night, the large car floats Jersey Central 36 and 48 were lying alongside the coal dock at the Long Island Terminal, East River. This is a very crowded place. It is the freight terminal of several railroads, and according to one witness there is always difficulty on account of this congestion. This condition must have been known to the captain of the tug No. 17, who had been for a long time a tugboat captain and was entirely familiar with the situation. It was also a circumstance which would naturally require care in approaching and landing unwieldy floats at such place.

The Jersey Central float 48 lay outside the Jersey Central float 36 and projected beyond the end of the 36 and beyond the end of the coal dock a considerable distance. Both the 36 and the 48 were tied up in the usual manner by two lines running from the 36 to the pier, a stern line and head line. The stern line was "5½ or 6 inch line and was made fast to the dock"; it was "a good line like new." The head line was the same size; "that was a good line not new but a good line." Both the floats lay stern outstream. The pump boat in question lay inshore a considerable distance away.

This coal dock or pier, alongside of which these floats were lying, was about 300 feet long. The bow of the 36 was about 100 feet from the bulkhead. The 36 was about 285 feet long, so she projected somewhat beyond the end of the pier. She was loaded with 15 freight cars and accordingly stuck up in the air considerably. Float 48, lying alongside of the 36, was 325 feet long, and as she was considerably longer than the 36, she projected still further out into the river. She also was loaded with freight cars. Both floats offered a considerable obstruction to any severe wind that might blow.

As one witness states: "It would act as a wall the same as a piece of canvas or something or other and would naturally receive a big effect from that wind blowing at that rate."

The above therefore is the situation of the car floats 36 and 48 (that went adrift), before they went adrift.

Burns, the captain of the tug Cutchogue, testifies that his tug was working at this coal dock at the time in question, and says: "I got orders to get a Delaware float which was on the outside of these floats Jersey Central 36 and 48. I got it on one line, pulled it out, and went out in the river where I lay in the stream, about 200 feet off the coal dock." In his opinion the float 48 was sticking out beyond the end of the pier about 40 or 45 feet. The testimony of other witnesses indicate a somewhat longer distance.

It is plain that both of these floats, especially the 48, stuck out in the stream a considerable distance. This was not unusual at this place, nor is it any evidence of carelessness. It is only mentioned in connection with the probabilities as to what occurred.

Burns further testifies that while he was so lying in the stream, off this pier, he saw the New York Central tug No. 17, with car float 45 on her starboard, and car float 13 on her port, coming up the river. She blew an arriving whistle requesting information where these two car floats were to go. The information was given to Burns, and he blew the No. 17 his location as slip 4, which was just above and alongside the coal dock or pier.

At that time slip 4 had three other boats in the slip, three car floats and a coal boat.

Burns then says that just about that time a "squall" came up from the northwest; that the tide was ebb, and "both this wind and tide set on to the coal dock."

It appears from the testimony of all the witnesses that a most unusual condition of weather existed at the time in question.

Mr. Scarr testified from the records of the weather bureau, on top of the Whitehall Building, that between 6 and 9 o'clock that evening the wind was southeast and blowing only at the rate of eight miles an hour; that it suddenly shifted to south to southwest to

northwest and attained about 9 o'clock a rate of 46 miles an hour, which increased in a few minutes to 66 miles an hour, at which rate it continued to blow about five minutes and then subsided considerably. It is indicated that the force of the wind may have been somewhat less along the river, but all the testimony shows a severe squall.

In other words, he testified that for a few minutes the wind attained a very high velocity and that this increase was most sudden. He states, "It was similar to squalls that occur in summer, during thunder storms."

It must also be borne in mind that the full force of this squall, according to Captain Burns, was towards these floats that were tied up at the coal dock or pier. The wind alone may possibly have been a probable explanation for the floats breaking loose.

Kamalich, a floatman who was on the float 36, says: "I was on the 36, which was the inside float. The 48 was outside. The wind blew like a gale and rain. I felt something like strike. The wind was very heavy. I felt something strike on the stern. I looked out and saw the stern drifting out. The line parted on the stern. The head line started to go. I jumped off. The float started to drift. I was on the bow of the 36 nearest the bulkhead. I had just about stepped on board. The wind and rain had just about started when they went adrift. It was in the middle of the squall that I felt a jar. When I looked the line had parted. I saw some boats outside 15 or 20 feet away. It was dark. I do not think it was right up against our boat."

This testimony rather indicates that floats 36 and 48 went adrift during the squall; that is, during the sudden rise in velocity of the wind already referred to.

Deede, the captain of the tug No. 17, testified that he had left Weehawken with float 45 on his starboard and float 13 on his port. That both the floats were three track car floats. That they were neither a light nor heavy load of cars. That he went down the North River to the Battery and then up the East River, against the ebb tide, to the Long Island Terminal. That this ebb tide was running about 4 miles an hour. That there was nothing unusual about the weather conditions until he had reached the vicinity of the Long Island Terminal. That when he came about off the pine dock, which is about 700 feet below the coal dock, he was then about 300 feet off the piers. That he blew for a location and received the 4 whistles from the tug Cutchogue "which meant I was to go into No.

4 slip." He says: "I was proceeding slowly under one bell, then the squall came up, *I starboarded my wheel and headed my two floats up to the wind and held them there until the worst of it was over* and then I steadied my boat up with a little port wheel and headed in for pier 4."

The captain of the tug Cutchogue says that owing to the position of the tug 17 with her floats between him and the coal dock he could not see the floats 36 and 48, but when he heard an alarm blown by the 17 and about a minute or two afterwards, he saw these floats under the stern of the floats in tow of the tug 17.

Deede, captain of the tug 17, says that these floats were not at the end of the coal dock when he was landing. That he probably had seen them when he was down opposite the pine dock, but that when he was landing his attention was directed closely to landing his own floats. That when this landing was effected his deck hand called his attention to the floats adrift, and when he had practically completed his landing, he blew an alarm to attract attention of other boats. That he did not hear his lookout give a previous warning of these floats adrift (which is not unreasonable in view of the weather conditions).

I think a careful consideration of all the testimony indicates that during the squall which only lasted for a few minutes the tug 17 and her car float were heading up into the wind and there was then no attempt to make a landing. There is no evidence that the landing subsequently made by the 17 was unusual or conducted in any way out of the ordinary. Apparently the only eyewitness, that may possibly be called one, is the floatman Kamalich, who was on float 36 and whose testimony indicates a "jar" felt during the "squall."

The question therefore remains how and why did these floats 36 and 48 go adrift. They were tied up in the usual way. This was the real issue in controversy.

Libelants claim that the tug 17 in making her landing must have run her starboard float 45 against the stern and of the Central float 48, which was, as I have shown, sticking out beyond the pier and beyond her sister float 36. That this contact was the result of carelessness and broke the line at the stern and that the strong wind then caused the 48 and 36 to break away. The claimants position is that there is no contact shown between the float 45 in tow of the tug 17. That it was the squall coming suddenly and with heavy

force against the outlying float 48 that broke her stern line, and then the bow line, alone, was unable to stand the strain and floats went adrift.

The burden to show a contact was on libelant. This burden is supposed to be met by proof that the car float 48, a week or so previously, had been painted with red lead and that shortly after the accident Mr. Spooner and several others found that the stern of the float 48 had been scraped by something, and on examining the side of the car float 45 which had been in tow of tug 17 they found evidence of red lead, etc., in, as one witness says, "identical" location with the claimed contact between the two.

Even this evidence, however, is disputed. A witness who was said to be present when this examination took place failed to see such marks, etc.

It is by this line of proof alone that libelants claim that a contact had been proved by a fair preponderance of evidence.

There was no eyewitness to any actual contact. The captain of the Cutchogue lying out in the stream didn't see it. The captain of the 17 absolutely denies it. A number of witnesses in the locality testified. Gaarlof, deck hand on the tug 17, said he saw the floats adrift when the 17 was about halfway between the coal dock and the pine dock. He says: "I saw barges hanging over the end of pier 4 when I first got on top of the car off the pine dock. That was before the storm started. The next thing I saw was the floats blowing off after the storm started. I had no trouble in seeing them and I reported to the captain these car floats adrift rightaway. The object of my warning was in case he might have to port his wheel." That later "at the time our tug was right on the end of the coal dock I hollered a second time." It was this second warning that the captain of the 17 says he heard and when he had completed the landing of his floats that he blew his alarm.

On recross-examination this witness confirmed this when he stated, "At that time the floats had landed at the bulkhead they had fetched up on the pump boat, he (the captain) blew the alarm to draw attention to some other boats."

Bond, a floatman at this terminal, testified: "when the floats were adrift I saw the Central tug 17 underway between the pine dock and the coal dock." "I don't believe she was in a position to have her line out. She was making her way toward No. 4 slip. I did not pay much attention then."

Woolsey, deck hand on tug No. 17, said he made an examination of the side of the float 45 after she had been landed and tied up and saw no paint nor scraping.

Francis, a floatman at the terminal, says that: "At that time there was heavy wind and rain I ran behind the cars when I seen the 17 coming in I came out on the end again and the Jersey Central floats were not there. The bow of the 17 was coming up towards the end of the coal dock. It was about 50 or 75 feet away." On cross-examination he stated: "The Jersey Central floats were not there because if they were there he cannot come in with the floats."

Riemers, a floatman at the terminal, testified: "The 17 had turned up in the wind in the squall and then he ported his wheel and came over. This was right after the squall. It had cleared up a little. It was a heavy rain."

In my opinion the testimony of all these witnesses seems to indicate that the floats were adrift before the tug 17 and her tow came near enough to the coal dock to strike the outlying 48. To be sure, I may go so far as to say that counsel for libelants can properly argue that the circumstances are suspicious and that possibly the side of the float 45 did come in contact with float 48 but such suspicion is not proof.

Both sides offered so-called expert opinions as to whether the squall would or would not be sufficient to break the line of the 48. They received answers that were expected.

The damage sustained by libelants is serious. If the captain of the tug 17 carelessly ran his float 45 into the 48 and broke her adrift, the responsibility for such damage should rest upon claimant. Claimants, however, have the right, before such liability is imposed, to have it proved by a fair preponderance of evidence.

I cannot say that all the witnesses were interested or biased. There were a number that testified. Not one of them saw any contact.

Counsel for claimant contends that the evidence against it is argumentative even if the paint marks were there as testified to by Mr. Spooner, who appeared to the court to be a straightforward and honest witness, and cites the case of the Newport (D. C.) 28 F. 658, affirmed (C. C.) 36 F. 910.

It is my opinion, after carefully considering all the testimony, that the libelants have failed to prove sufficient facts to show negligence on the part of the captain of the No. 17 by a fair preponderance of evidence.

In view of the peculiar conditions of the weather, I cannot say that it was more probable that the captain of the No. 17 was careless or that a contact between the 45 and the 48 occurred. To hold claimants liable would be solely because of some red lead found on the side of float 45 which looked like or was identical with red lead on the side of float 48, as to which certain witnesses testify there were no such red lead or marks present.

It is my opinion therefore that the libels must be dismissed.